THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRIAN D. LePRETRE, Defendant-Appellant.
Fourth District   No. 4—89—0473

Opinion filed April 5, 1990.

112

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

John B. Huschen, State's Attorney, of Eureka (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On April 21, 1989, following a jury trial in the circuit court of Woodford County, defendant Brian LePretre was convicted of committing the offense of attempt (murder). (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 9—1.) He was subsequently sentenced to the minimum six-year prison term. He now appeals, alleging (1) he was not proved guilty beyond a reasonable doubt; (2) the court improperly refused his tendered jury instructions; (3) he received ineffective assistance of counsel; (4) the court erred by refusing to allow him to recall a wit-

114

ness; and (5) the court's post-trial comments indicate the court should have granted defendant's post-trial motion. We affirm.

On January 5, 1989, defendant was charged in the circuit court of Woodford County with committing the offense of attempt (murder). (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 9—1.) The information alleged defendant performed a substantial step toward the commission of murder, in that he knowingly thrust a knife toward Bernard Remmert with the intent to kill him. Defendant raised the affirmative defense of voluntary intoxication. The jury trial commenced on April 19, 1989.

The State's first witness was Bill Myers, under-sheriff of Woodford County. He stated he interviewed defendant on January 5, after defendant's arrest for the instant offense. After waiving his *Miranda* rights, defendant told Myers that his sister and brother-in-law, Michelle and Daniel Schirer, picked him up on December 31 around 7:30 p.m., and they went to a bar in Metamora for a New Year's Eve party. While there, he had six to eight drinks of Jack Daniels and Coke. He also had one glass of champagne at midnight and two puffs from a marijuana cigarette. At approximately 2 a.m., they left the bar and returned home.

Defendant told Myers that the Schirers then dropped him off at his residence. However, he was not feeling well and decided to walk around for awhile. At this time, he thought it was around 2:30 a.m. He walked around for a couple hours. Around 5 a.m., he was at the north end of Remmert Funeral Home parking lot and he saw Bernard Remmert. Defendant knew who Remmert was, though he had not seen him or spoken to him for several years. Defendant walked through the parking lot and later returned. He chatted with Remmert for awhile, and Remmert invited him in for some coffee.

They entered the funeral home and went to Remmert's office, where Remmert began making coffee. Defendant then jumped Remmert and put his left arm around Remmert's chest and neck area. Defendant pulled a knife out of his coat pocket with his right hand, and they struggled. The next thing defendant remembered was that he was lying on the floor, with Remmert on top of him.

After they calmed down, Remmert let defendant up. They talked about the attack and drank coffee. Defendant could not remember why he attacked Remmert or the actual attack. Remmert then let defendant go home. Upon his return, defendant told his parents about the attack, but failed to mention the knife.

Myers recovered the knife from the scene. The blade had been broken during the fight. The knife had a four-inch body and a three-inch blade. On cross-examination, Myers acknowledged that defendant

was always cooperative, never indicated he had an intent to kill Remmert, and could not remember any of the incident after he took the knife from his pocket.

Bernard Remmert testified that at 5 a.m. on January 1 he was at his funeral home, having just picked up a body from a nursing home. As he exited the hearse, he could hear someone walking in the alley behind him. As he entered the funeral home, Remmert waved a greeting at the person, who continued through the parking lot, heading south. After entering, Remmert proceeded to turn up the heat, and thought the person might be his tenant who lives in the house to the north. He thought this tenant might have overindulged in partying the night before and was now walking it off. He decided to invite him in and offer him a cup of coffee.

Remmert stepped outside, where it was still dark, and invited the person in for coffee. After they entered the building and the bright light, Remmert noticed the person was not the tenant. In response to Remmert's question, the person explained he was a Roanoke boy and his name was Brian LePretre. Remmert asked him if he was the son of Nancy and Armand, who are good friends of his. When defendant responded affirmatively, Remmert felt more comfortable. As they walked to his office, they discussed the fact that defendant had been in the military service in Germany and was discharged last April.

Once they entered the office, Remmert went to the coffee pot to make the coffee. Defendant was walking behind him. Defendant suddenly jumped on Remmert's back and got an arm lock, using his right arm, on Remmert's neck. The arm was under Remmert's chin and across his neck. Remmert was having trouble breathing.

The next thing Remmert knew, defendant started bringing his left arm down and, out of reflex, Remmert lifted his arm up to block it. Defendant's arm crossed Remmert's and, for the first time, Remmert saw the knife. The point of the knife pricked Remmert's shirt several times and cut a tear in his coat, but he was not injured. The knife was poised over his heart, and defendant was applying a lot of pressure. They wrestled around the room, breaking furniture and banging into the wall. Defendant kept pressing with the knife. Eventually, after several minutes, Remmert was able to shove defendant to the ground.

Remmert climbed on top of defendant and picked up the knife, which was now broken. Defendant then began saying he was sorry and that he did not know what he was doing. Remmert helped defendant up and seated him on the couch. Remmert asked defendant why he attempted to kill him. Defendant repeatedly stated, "I don't

know." Defendant said he was sorry and asked Remmert to not call the sheriff. Defendant explained he had never done anything like this before.

They then had a cup of coffee and talked. Remmert indicated he would not call the sheriff and stated that defendant should get in-house help. He let defendant go home. When he told his wife what happened, she insisted that he call the sheriff. He then called defendant's parents.

Remmert explained that other than various scratches, bruises and a banged-up ankle, he suffered no injuries. He did not believe defendant was intoxicated or high on anything. He denied telling defendant's mother that he thought defendant was high. He explained that he asked her if defendant was possibly on drugs or drank a lot. The State then rested.

Defendant's first witnesses were his sister and brother-in-law, Michelle and Daniel Schirer. They picked defendant up around 7:30 p.m., and arrived at the bar around 8 p.m. While there, Daniel drank screwdrivers, Michelle drank some beers and some sodas, and defendant drank Jack Daniels and Coke. They estimated defendant drank three to four drinks per hour. They all had some champagne at midnight. They stayed at the bar until around 3:45 a.m., and arrived at defendant's parents' house around 4 a.m.

They were both of the opinion defendant was intoxicated when they dropped him off. Daniel based his opinion on the fact defendant seldom drank, the amount he drank, and the fact his eyes were glazed. Michelle based her opinion on the amount defendant drank, his lack of drinking experience, his gayer and happier mood, and the fact he vomited on his parents' driveway when he exited the car.

However, neither observed that defendant had any trouble walking. They both acknowledged defendant danced some, and they did not observe him the entire evening. Michelle also admitted that, after vomiting, defendant responded to her question asking if he was alright.

Stan Schertz testified that he was also at the party with defendant. He left between 2 and 3 a.m. He was the designated driver of his group, so he drank only one glass of champagne. He estimated defendant consumed three to four mixed drinks per hour. It was his opinion, based on defendant's staggering walk and stuttering speech, that defendant was drunk when Schertz left.

Defendant's mother testified that, on January 1, Remmert told her that defendant was inebriated or high on something. She explained that Remmert never said that was his opinion, but she got the

opinion from their conversation that it was. She also observed vomit in her driveway that morning.

Defendant testified he is 22 years old and currently lives with his parents. At the party, he drank Jack Daniels and Coke and one glass of champagne. He does not remember how many mixed drinks he drank. He also had two puffs on a marijuana cigarette. They left the bar around 2 a.m. and arrived home around 2:30 a.m. Once he got home, he threw up on the driveway. At that point, he decided to walk uptown to get some air. As he walked, he went through the funeral home parking lot and said hello to Remmert. He later turned around and went back to the parking lot. Remmert came outside and asked if he would like a cup of coffee.

They, then, went to the office. Prior to this, defendant did not know Remmert. As Remmert was working on the coffee machine, defendant remembered bringing his left arm up. Defendant is right-handed. The next thing he remembered is that he was on the ground, with Remmert in control of him. Then, they sat on the couch and Remmert asked why it happened. Defendant told Remmert he did not know, and that there was no reason for it. Defendant apologized repeatedly. Remmert stated he would not press charges, but would call defendant's parents. At that time, the defendant went home.

On January 5, defendant spoke with Deputy Myers. However, he denied telling Myers any of the details of the fight, or that it took place at 5 a.m. Defendant believed he was intoxicated and stated he did not go into the funeral home intending to kill Remmert.

On cross-examination, he explained he could not remember how many mixed drinks he had. When he told Myers he had six to eight drinks, he only guessed. He does not remember eating a sandwich or hearing last call, but he does remember arriving home. He also remembers carrying the knife with him that night. He remembers walking around town, including several of the places that he passed.

Dr. Robert Chapman was qualified as an expert in the field of psychiatry and forensic psychiatry. He interviewed defendant on February 13, 1989. Prior to his examination of defendant, Chapman interviewed his sister and reviewed various reports, including a psychiatric examination from the Veterans Administration Hospital. Chapman related what defendant told him about the night in question. It correlated with defendant's testimony, except that Chapman remembered defendant specifically saying he consumed six to eight drinks during the evening. His examination showed defendant was free of any major mental disorder or defect. He made three diagnoses concerning defendant's status at the time of the offense. First, he believed

defendant was suffering from acute alcohol-abuse syndrome, also known as alcohol intoxication. Defendant was also suffering alcohol blackout. The third diagnosis was that of episodic discontrol, which has also been referred to as intermittent explosive disorder or an isolated explosive disorder. It was Chapman's opinion that defendant was not suffering from a mental disease at the time of the offense. It was also his opinion that defendant's intoxication was such that it interfered with his power of reason.

On cross-examination, Chapman admitted that much of the information he relied on in forming the opinion came from defendant and his sister and, if the information was incorrect, it could affect his opinion. The defense rested.

Remmert testified, on rebuttal, that defendant was walking fine the entire time. When they spoke, defendant always answered responsively. He never noticed any slurred or stuttered speech, and he never smelled any alcohol on defendant's breath. Defendant never staggered or supported himself.

Defendant was found guilty of the charge. He was eventually sentenced to the minimum six years' imprisonment. Defendant now appeals.

Defendant initially argues he was not proved guilty beyond a reasonable doubt. He observes he raised the affirmative defense of voluntary intoxication. (Ill. Rev. Stat. 1987, ch. 38, par. 6—3.) He notes that when an affirmative defense is raised by the pleadings or the evidence, the State has a burden of proving the defendant guilty beyond a reasonable doubt as to that issue, together with all the other elements of the defense. (*People v. Smith* (1978), 71 Ill. 2d 95, 105, 374 N.E.2d 472, 476.) He does not believe the State has done so.

■■ ■ In order to constitute an affirmative defense, voluntary intoxication must be so extreme as to suspend all reason. (*People v. Bradney* (1988), 170 Ill. App. 3d 839, 855, 525 N.E.2d 112, 122.) Merely being drunk or intoxicated is insufficient to create the defense. (*People v. White* (1977), 67 Ill. 2d 107, 119, 365 N.E.2d 337, 343.) The question is not whether the defendant was intoxicated, but whether the evidence demonstrates beyond a reasonable doubt that the defendant could have formed the requisite mental state for the crime charged. (*People v. Aguirre* (1975), 30 Ill. App. 3d 854, 857-58, 334 N.E.2d 123, 127.) There are many levels of intoxication through which an individual may pass before he reaches the level of being unable to form the intent to act. (*Bradney*, 170 Ill. App. 3d at 855, 525 N.E.2d at 122.) The weight to be accorded testimony relating to this defense is peculiarly within the province of the trier of fact. *Bradney*,

170 Ill. App. 3d at 855, 525 N.E.2d at 122.

When a defendant raises a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) The relevant question is whether, if after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

Defendant believes the evidence establishes that he did not have the requisite intent. He points to the testimony of those at the party, which established he drank three to four drinks per hour. They are also of the opinion that he was intoxicated. This is borne out by his being unsure of the time that he left the bar, not being sure the number of drinks he consumed, and vomiting in the driveway. He also observes he blacked out totally during the attack and that it was a totally irrational, violent act. He finally rests on the expert testimony of Dr. Chapman, who stated his opinion that defendant did not possess the required intent.

In determining whether a defendant was so intoxicated that his powers of reason were totally suspended, the trier of fact is not obligated to rely on the testimony of experts to the exclusion of other evidence relevant to the defendant's mental state. Rather, the trier of fact may consider the opinion of experts, together with all of the other evidence relevant to the defendant's mental state at the time of the offense, and reject the expert testimony if it deems the other evidence more probative. *Bradney*, 170 Ill. App. 3d at 855, 525 N.E.2d at 122.

In the present case, the evidence, considered in the light most favorable to the State, establishes that the defendant drank six to eight mixed drinks over an eight-hour period. While his companions opined he was intoxicated, they were unable to point to many factors other than the amount he drank. These assessments were based on conduct from one hour to three hours prior to the time of the attack. Thus, the jury could have found that if defendant had been intoxicated, he may have sobered up. Further, defendant's sister stated he responded appropriately to her question after he vomited. Defendant was able to relate where he walked and what places he passed. When he met Remmert, they were able to carry on a normal conversation. Defendant was able to explain his military background and answer other questions. Remmert observed no slurring of speech or stagger-

ing of his walk. Once the episode was over, defendant was again able to carry on a conversation and then walk home. Admittedly, defendant said he blacked out during the attack but, due to his rational conduct both before and after the episode, the jury could reasonably have disregarded this testimony. Similarly, the jury could have disregarded Dr. Chapman's opinion, since it was based, in good part, on statements of defendant and his sister, and does not conform to the other evidence.

We acknowledge that, due to the unexplainable irrational conduct, this case is factually close. However, it is in just such cases that the opportunity for the jury to observe and to evaluate the witnesses is so valuable. We cannot say that, based on the recited evidence, no rational trier of fact could have found defendant guilty beyond a reasonable doubt. The evidence is sufficient.

Defendant next contends the court erred in refusing to submit his proffered instructions on the offense of reckless conduct (Ill. Rev. Stat. 1987, ch. 38, par. 12—5), which he maintains is an included offense of attempt (murder).

Initially, the court had accepted the instruction over the State's objection. However, later, prior to the closing argument, the State sought to give instructions on aggravated battery (Ill. Rev. Stat. 1987, ch. 38, par. 12—4), asserting this is also an included offense. Defendant objected, and a recess for research purposes was taken. After the recess, the court concluded, based on *People v. Primmer* (1983), 111 Ill. App. 3d 1046, 444 N.E.2d 829, that reckless conduct is not an included offense of attempt (murder) and, reversing its earlier decision, denied defendant's proffered reckless conduct instructions.

■■ ■ A defendant is entitled, under certain circumstances, to have the jury instructed as to an offense less serious than that with which the defendant is charged. (*People v. Roberts* (1989), 189 Ill. App. 3d 66, 72, 544 N.E.2d 1340, 1345.) The purpose of such a rule is to give the jury a third option by permitting it, if it deems the defendant not guilty of the charged offense but reluctant to completely acquit him, an opportunity to find the defendant guilty of a lesser offense, if the jury finds the proof of the lesser offense strong enough to convict. (*People v. Bryant* (1986), 113 Ill. 2d 497, 502, 499 N.E.2d 413, 415.) An included offense instruction is only proper when the charged offense requires the jury to find an element which is not required for conviction of the lesser offense (*People v. Cramer* (1981), 85 Ill. 2d 92, 100, 421 N.E.2d 189, 192), or, stated in another way, an included offense is an offense which contains some, but not all, of the elements of the greater offense and contains no element not included

in the greater. *People v. Traufler* (1987), 152 Ill. App. 3d 987, 990, 505 N.E.2d 21, 23.

■■ However, as our supreme court has observed, in something of an understatement, the grounds for determining whether a particular offense is included in another are not always clear. (*Bryant*, 113 Ill. 2d at 502, 499 N.E.2d at 415.) Section 2—9 of the Criminal Code of 1961 (Code) provides the following definition:

" 'Included offense' means an offense which

(a) Is established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." (Ill. Rev. Stat. 1987, ch. 38, par. 2—9.)

The supreme court has recognized that this definition does not explain which of the following is determinative in deciding if a particular offense is an included offense of another: (1) the abstract statutory definition of the greater crime; (2) the greater crime as it is alleged in the indictment or other charging instrument; or (3) the greater crime as its necessary elements are proved at trial. (*People v. Mays* (1982), 91 Ill. 2d 251, 255, 437 N.E.2d 633, 635.) The courts have recognized that either review of the abstract charge, or review of the offenses as charged, is an appropriate means to be used. *People v. Bratton* (1989), 178 Ill. App. 3d 718, 727, 533 N.E.2d 572, 578; *Traufler*, 152 Ill. App. 3d at 991, 505 N.E.2d at 23-24.

Defendant acknowledges that this court previously answered the question of whether reckless conduct is an included offense of attempt (murder) in *Primmer*. There, the court stated:

"The offense of reckless conduct in shooting at David Farris was not an included offense of the attempt to murder David Farris because the reckless conduct charge, which defendant deems an included offense, required an endangering of the safety of Farris while the attempted murder charge had no such element." (*Primmer*, 111 Ill. App. 3d at 1053, 444 N.E.2d at 834.)

Similar conclusions have been reached by other courts. See *People v. Smith* (1980), 90 Ill. App. 3d 83, 86, 412 N.E.2d 1102, 1105; *People v. Coleman* (1985), 131 Ill. App. 3d 76, 80, 475 N.E.2d 565, 568.

Defendant argues that *Primmer* was decided prior to the supreme court's decisions in *People v. Dace* (1984), 104 Ill. 2d 96, 470 N.E.2d 993, and *Bryant*. He believes these cases require a different conclusion.

In *Dace* and *Bryant*, the court looked to the evidence proved at trial and the language contained in the charging instrument. Thus, in

*Bryant*, the court held that criminal damage to property is an included offense of attempt (burglary), where the indictment alleged that the substantial step toward the burglary was breaking of a window, and the evidence adduced at trial would have supported a criminal damage conviction. The court concluded it was not necessary to have all the elements of the included offense contained in the charge, as long as the charging instrument sets out the main outline of the lesser offense for which an instruction is sought. (*Bryant*, 113 Ill. 2d at 505, 499 N.E.2d at 416-17.) Accordingly, *Bryant* seems to conclude that included offense instructions should be given when the elements in the included offense are, in a broad sense, included in the offense charged, and the evidence that develops at trial proves the included offense. *Roberts*, 189 Ill. App. 3d at 74, 544 N.E.2d at 1346.

■ However, we need not determine if *Bryant* changes the *Primmer* holding because, even if *Bryant* does apply, it is apparent defendant is not entitled to the proffered instruction. The court, in *Bryant*, observing that restrictions upon the use of included instructions do exist, stated:

"There are several notable limits on the operation of the included-offense doctrine, however. For example, because a defendant's instruction on a lesser offense is appropriate 'if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.' (*Keeble v. United States* (1973), 412 U.S. 205, 208, 36 L. Ed. 2d 844, 847, 93 S. Ct. 1993, 1995), the evidence presented in a particular case might rationally preclude the use of an instruction on a lesser offense. (See *Hopper v. Evans* (1982), 456 U.S. 605, 612-13, 72 L. Ed. 2d 367, 373-74, 102 S. Ct. 2049, 2053-54; *People v. Perez* (1985), 108 Ill. 2d 70, 81-83; *People v. Mitchell* (1984), 105 Ill. 2d 1, 14.) Moreover, an included-offense instruction ' "is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense." ' (*People v. Cramer* (1981), 85 Ill. 2d 92, 100, quoting *Sansone v. United States* (1965), 380 U.S. 343, 349-50, 13 L. Ed. 2d 882, 887-88, 85 S. Ct. 1004, 1009.) Thus, instructions on less serious offenses are not required in every case." *Bryant*, 113 Ill. 2d at 507, 499 N.E.2d at 417-18.

■ Defendant asserts the evidence in this case would support a reckless conduct conviction. A person is guilty of this offense if he harms or endangers the safety of another, and he recklessly performs the acts which did so. (Ill. Rev. Stat. 1987, ch. 38, par. 12—5.) Defend-

ant submits that the reckless act in this case was his becoming intoxicated at the bar, and it was due to this intoxication that the attack occurred.

■■ Section 4—6 of the Code provides that a person acts recklessly when he consciously disregards a *substantial* and unjustifiable risk that a result will follow. (Ill. Rev. Stat. 1987, ch. 38, par. 4—6.) This clearly connotes a certain sense of foreseeability that the result will occur from the conduct. We do not believe this is such a situation. The evidence establishes that between one and two hours after defendant ceased drinking, he suddenly attacked and attempted to kill a man defendant hardly knew and who had offered defendant some assistance. It would be difficult to conclude that defendant, as he was becoming intoxicated, was consciously disregarding the risk that he would subsequently, due to the drinking, attack with a knife and attempt to kill another for no apparent reason. While it could be argued that it is conceivable that something like this would occur, we note the definition requires a substantial risk. This is not such a risk.

Defendant can cite no cases where the alleged reckless act is so distant or attenuated from the harm to the victim, or where the resulting harm was due to such an unlikely outcome of the reckless act. To hold as defendant suggests would seem to require that in any case where a perpetrator's intoxication can be related to the actual harmful conduct, irregardless of the remoteness or the unlikelihood, his conduct can be viewed as reckless. We believe this is neither the scope nor intent of section 4—6. Defendant's intoxication is properly addressed to his affirmative defense. We, therefore, hold that, under the circumstances of this case, the evidence would not support a reckless conduct conviction. Accordingly, since the evidence would not permit a jury to rationally find defendant guilty of that offense, his offered instructions were properly refused.

Defendant next contends he received ineffective assistance of counsel, since his counsel objected to the State's included-offense instructions alleging aggravated battery.

■■ The United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, formulated a two-part test for evaluating whether a claim of ineffective assistance of counsel rises to the level of a constitutional deprivation. Defendant must first demonstrate that counsel's performance was deficient. (*People v. Owens* (1989), 129 Ill. 2d 303, 309, 544 N.E.2d 276, 278.) Defendant must also prove that his counsel's deficient performance substantially prejudiced his defense. (*Owens*, 129 Ill. 2d at 309, 544 N.E.2d at 278.) To meet this second test, a defendant must show

a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Defendant observes that courts have held that aggravated battery can be an included offense of attempt (murder). (See *People v. Gvojic* (1987), 160 Ill. App. 3d 1065, 513 N.E.2d 1083; *People v. Cross* (1980), 84 Ill. App. 3d 868, 406 N.E.2d 66.) Therefore, defendant maintains that counsel was mistaken in objecting to the instructions, and this conduct falls below the level of professionalism required. He also believes he was prejudiced by this conduct because, since the case is closely balanced, the jury might have chosen the "third option" and convicted him of the lesser charge, while acquitting him of the greater.

However, a review of the record establishes that counsel was not acting under a mistaken belief. Rather, he forcefully argued that the evidence presented would not support an aggravated battery charge. To properly evaluate counsel's conduct, it is necessary to be aware of the procedural background.

As noted earlier, at the jury instruction conference the court accepted, over the State's objection, defendant's reckless conduct instructions. Later, prior to closing argument, the State sought to have the questioned instructions accepted. Defense counsel objected, and a recess was taken. Upon the court's return, it reversed its earlier decision and refused defendant's reckless conduct instructions. At this point, the State withdrew its aggravated battery instructions, while defense counsel, to no avail, sought to have the court reconsider its reckless conduct ruling.

Thus, it is clear that counsel's objections were based on trial strategy. At the time he made the objections, the jury was to be instructed on attempt (murder), a Class X felony (Ill. Rev. Stat. 1987, ch. 38, par. 8—4(c)), and reckless conduct, a Class A misdemeanor (Ill. Rev. Stat. 1987, ch. 38, par. 12—5(b)). This is sound strategy. It was not until after he had argued forcefully against the aggravated battery instructions (a Class 3 felony (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(e))) that the reckless conduct instructions were removed. By then, it was too late, since this position had been taken. It could be argued that counsel should not have objected at all. After all, having two included charges is better than none. However, his desire was to ensure that the only included charge was a misdeamnor and not a felony. Since counsel is continually subject to criticism in hindsight for strategies which may not have been successful, judicial scrutiny of counsel's performance must be highly deferential. (*Strickland,* 466

U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Courts presume that counsel's performance falls within the wide range of professionally competent assistance. (*Owens*, 129 Ill. 2d at 309, 544 N.E.2d at 278.) To overcome this presumption, the defendant must prove that his counsel's representation fell below an objective standard of reasonableness. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) We have no doubt that other counsel may have proceeded differently. However, this is true of every case. Counsel's strategy was sound and is definitely within the range of acceptable representation.

Defendant argues, in the alternative, that the court should have *sua sponte* given the. aggravated battery instructions. Defendant failed to include this assertion in his post-trial motion, and it is, therefore, waived. *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 181, 415 N.E.2d 1027, 1029.

Defendant next maintains the court erred by refusing to allow him to recall a witness. After Schertz testified and was excused, defendant made a request to recall him. This was done while it was still defendant's case in chief. In an offer of proof, Schertz testified that he observed defendant drink champagne out of a party horn and break plastic glasses against his head. Schertz explained that he remembered this after he left the stand and brought it to defense counsel's attention. The court declined to let him be recalled.

It is well settled that the decision of whether to allow recall of a witness is left to the sound discretion of the trial court. (*People v. Harris* (1979), 74 Ill. 2d 472, 477, 386 N.E.2d 60, 62; *People v. Smith* (1986), 149 Ill. App. 3d 145, 152, 500 N.E.2d 605, 610.) This ruling will not be reversed, absent a clear abuse of discretion. *Smith*, 149 Ill. App. 3d at 152, 500 N.E.2d at 610.

The offered testimony is simply further evidence of defendant's intoxication. This is merely cumulative, since there already existed substantial evidence on this point. Further, the testimony dealt with defendant's level of intoxication at midnight, which is over five hours prior to the incident. Thus, it is of marginal probative value concerning defendant's state of mind at the time of the offense. We find no abuse of discretion.

Lastly, defendant insists the trial court erred by failing to grant his post-trial motion. At the sentencing hearing, the court found, in mitigation, that defendant did not contemplate that his conduct could cause or threaten serious physical harm to another. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.1(a)(2).) Defendant notes that to be found guilty of attempt (murder), it is essential that he be found to

have intended to kill Remmert. He maintains the court's finding is contrary to the presence of such an intent and is tantamount to an acquittal. Therefore, he insists the court erred by not granting defendant's post-trial motion.

This question has already been resolved by *People v. Hendricks* (1986), 145 Ill. App. 3d 71, 495 N.E.2d 85, *aff'd* (December 21, 1988), No. 63803, *rehearing granted* (1989). There, in refusing to impose the death penalty, the trial judge observed he was not convinced beyond a reasonable doubt of defendant's guilt. An argument identical to the present one was made by Hendricks' defense counsel. The reviewing courts observed that the court had already denied the motions for directed verdict, alleging the sufficiency of the evidence, and that the trial court specifically stated the evidence was sufficient to convict. The courts held the comments were made in the context of sentencing and were not a comment on the sufficiency of the evidence.

■■■ Similarly, in the present case, it is clear the comments are solely made in the sentencing context. The court specifically made this clear when it stated:

> "So, with regard to Factor No. 2 as to sentencing only, Court would conclude independent of the jury's conclusion, particularly given the fact there is no particular burden on these findings, that the Defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another."

Further, the court earlier denied motions for directed verdicts, and later denied the post-trial motion which specifically raised the question of the sufficiency of the evidence. Thus, pursuant to *Hendricks*, there is no error.

Affirmed.

SPITZ and McCULLOUGH, JJ., concur.