In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2759

DISHON MCNARY,

*Petitioner-Appellant,*

*v.*

MICHAEL LEMKE, WARDEN,[1]

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 5185—**Charles P. Kocoras**, *Judge.*

ARGUED SEPTEMBER 10, 2012—DECIDED FEBRUARY 26, 2013

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Dishon McNary is currently
serving two life sentences, without the possibility of
parole, in an Illinois state prison. After failing in state

[1] The warden at the time McNary filed his petition was
Marcus Hardy. Hardy has since been replaced by Michael
Lemke, and we have changed our caption accordingly.

court on both direct appeal and post-conviction review, McNary petitioned the district court for a writ of habeas corpus. McNary sought relief on the grounds that he received ineffective assistance of trial and appellate counsels in his state court proceedings. The district court denied the writ, and we now affirm.

## I. BACKGROUND

The facts presented here come from the witnesses' testimony at trial and the Illinois Appellate Court's summation of that testimony in its three opinions on this case.

At approximately 8:00 a.m. on March 20, 1998, 25-year-old Dishon McNary departed from his mother's house for his carpentry job. A few hours later, at 1:00 p.m., he left work for the day and proceeded straight to the liquor store. There, he bought a half-pint of Hennessy cognac and a six-pack of beer. McNary returned to his mother's house, where he drank most of the cognac and one beer. He then decided to take his 1986 Chevy Caprice to a car wash, where he sat for about an hour and finished the rest of the cognac. From that point, the timing of events is fuzzy. McNary drove to a lounge. He had a few drinks before returning to the liquor store and purchasing a full pint of cognac. McNary then headed to a friend's house, where he and three others played cards for a few hours. In that time, the four consumed most of the pint of cognac, along with a twelve-pack of beer. When the games ended, McNary drove to his sister's house. Finally, at well past 1:00 a.m., McNary decided it was time to head home. He

was "feeling high" but thought he could drive. (R. 16-2 at 471.)

When McNary pulled away from his sister's home, he noticed a car that appeared to be following him. As he continued on his way, the car pulled alongside his own vehicle. When he saw one of the car's occupants bend down, McNary feared he would be carjacked and stepped on the gas. He accelerated to between fifty and sixty miles per hour on a road with a posted limit of thirty-five. Speeding down the road, McNary hit something. But he kept going. As he glanced back, the menacing car still pursued. So, when McNary came to a red light, he ran it. The car behind him did the same. McNary accelerated to an estimated eighty or ninety miles per hour. He ran another red light and deliberately bypassed his home. He did not want to lead his pursuers there. McNary ran one more red light and remembered nothing further until waking up in the hospital the next morning, sometime after 10:00 a.m.

\* \* \*

Sadly, McNary claimed the lives of three individuals that evening. When he first hit "something" on his way home, he collided with Eric Marshall, a pedestrian attempting to cross the street. The impact sent Marshall flying into the air, and McNary's car struck him a second time as he descended to the ground. Marshall later died of injuries sustained in the collision. He was the father of two children, who, at the time, were ages seven and one.

Police officers observed the hit-and-run and began pursuing McNary, who continued to drive. After running

his third red light, McNary remembered nothing further. In that time, he ran through a fourth red light and struck a Dodge Neon. Both occupants of that vehicle, Benjamin Burrage and Shauntel Moffett, died. Several police officers, including José Martinez and Richard Hardesty, caught up to McNary at the accident scene. The officers pulled McNary from the burning wreckage of his vehicle. He was unconscious but smelled strongly of alcohol. Martinez would later testify that he "placed [McNary] in custody" at that time. (R. 16-2 at 350.) Within a few minutes, an ambulance came and transported McNary to Cook County Hospital. Officer Martinez was ordered to the site of the hit-and-run with Marshall, while Officer Hardesty stayed at the scene of the auto accident to investigate.

At approximately 3:50 a.m., Officer Hardesty went to Cook County Hospital to interview McNary. McNary claims not to remember this conversation, (*id.* at 478), but Hardesty described him as "[l]ucid," (*id.* at 410). Hardesty introduced himself as an officer investigating the crash and asked McNary if he had been drinking. McNary responded that he had had two beers and two shots. Hardesty then asked how the accident happened. McNary said, "I seen the man standing in the middle of the street[;] I beeped my horn[;] he did not move[;] I kept on going." (*Id.* at 411.) At that point, Hardesty informed McNary that he was being placed under arrest. Hardesty read McNary the "Warnings to Motorist," which Illinois police officers read to individuals arrested for driving under the influence. The warnings discuss the penalties associated with refusing to have blood alcohol

content (BAC) tested and with registering a result above the legal limit. Upon hearing the warnings, McNary agreed to have his BAC tested. Blood samples collected between 4:30 and 4:45 a.m.—almost three hours after the accident—came back with a BAC of .22, nearly three times the legal limit in Illinois. *See* 625 ILCS 5/11-501.

At approximately 8:00 a.m. the same morning, Investigator Theodore Ptak also interviewed McNary in the hospital. Again, McNary does not remember this conversation. Prior to speaking, Investigator Ptak advised McNary of his *Miranda* rights, which McNary indicated he understood. McNary subsequently told Ptak that he had consumed two shots of cognac, three beers, another half-pint of cognac, and several more beers over the course of the evening. McNary also told Investigator Ptak about the car that had caused him to flee. McNary admitted that while trying to outrun the pursuing vehicle, he had hit a pedestrian, but "he did not stop because he knew that he was drunk and that there were squad cars behind him, chasing after him for striking the pedestrians [sic]." (R. 16-2 at 523.)

After further investigation, the State of Illinois charged McNary with three counts of reckless homicide and three counts of murder. As the case proceeded to trial, McNary claimed that his statements to Hardesty and Ptak were not knowingly or voluntarily made and thus moved to suppress them. Notably, defense counsel conceded that McNary was not in custody until sometime after talking with Officer Hardesty. (*Id.* at 85.) After holding a suppression hearing, the state trial court

found McNary's arguments unpersuasive and denied the motion.

Two months later, on the morning jury selection was scheduled to start, defense counsel informed the court that McNary's sister, Carla, had important additional information. Counsel did not renew the motion to suppress but merely wanted to get Carla's testimony on the record to preserve the matter for appeal. (*Id.* at 147-48.) Counsel explained that he had "interviewed the members of the family" but "did not find . . . out [about Carla's information until] after the motion [to suppress] had been ruled upon." (*Id.* at 148.) During a break in trial, and outside the presence of the jury, the trial court allowed Carla to testify on the record. She said that at "1:00 something" a.m., a friend came to her house and let her know about McNary's car accident. (*Id.* at 600.) Carla then said that she went immediately to Cook County Hospital. The trip took her between fifteen and twenty minutes, so she arrived at "almost 2:00" a.m. (*Id.* at 599.) When Carla entered the trauma center, she saw McNary handcuffed to his hospital bed with a police officer sitting in a chair next to him. (*Id.* at 598-99.) She also claimed that a nurse told her McNary was under arrest. (*Id.* at 598.) Carla stayed until McNary was wheeled out of the room at "2:00 something." (*Id.* at 602-03.)

At trial, Officers Martinez and Hardesty, as well as Investigator Ptak, testified to the facts described earlier. McNary also testified to what he remembered. At the close of evidence, the defense requested a jury instruc-

tion on voluntary intoxication. The trial court heard arguments on both sides but ultimately rejected the instruction. The court reasoned that voluntary intoxication, under Illinois law, could only be a defense to a crime if the "condition existed to such a degree as to render [the] defendant wholly incapable of forming the requisite intent." (*Id.* at 556-57.) The court decided that "[t]here [was] evidence . . . which clearly establishe[d] that the defendant was not intoxicated to such an extent"; thus, the instruction was not warranted. (*Id.* at 558.)

On May 27, 1999, the jury found McNary guilty of two counts of first-degree murder for the deaths of Benjamin Burrage and Shauntel Moffett, the occupants of the Dodge Neon. The jury also found McNary guilty of one count of aggravated reckless homicide for the death of Eric Marshall, the pedestrian. At his sentencing on June 29, McNary received two life sentences in prison, without the possibility of parole, for the first-degree murder convictions, and a ten-year sentence for the aggravated reckless homicide conviction. He would serve all sentences concurrently.

McNary timely appealed his convictions to the Illinois Appellate Court. *People v. McNary*, No. 1-99-2370 (Ill. App. Ct. 2001) (unpublished order). There, McNary made several arguments, including ineffective assistance of trial counsel. Two of counsel's alleged failures are relevant here: not proving that McNary was in custody while speaking to Officer Hardesty, and eliciting prejudicial testimony from McNary. (R. 8-4 at 3-4.)

Under the first argument—the custody issue—McNary pointed to three omissions at the suppression hearing

that allegedly resulted in ineffective assistance: (1) not questioning McNary himself about whether he felt free to leave during his conversation with Hardesty; (2) not calling Carla until after the court had ruled on the motion; and (3) not questioning Officer Martinez about putting McNary in custody at the scene of the auto accident. In upholding McNary's convictions, the Illinois Appellate Court rejected each of those arguments. The court found that it was reasonable for trial counsel not to have asked McNary about his conversation with Hardesty, since McNary himself said he could not remember it. (*Id.* at 56.) Second, the court found that trial counsel acted reasonably in not calling Carla. Specifically, the court said that, "in light of the overwhelming evidence presented by the State," Carla's testimony would have had "minimal impact on the outcome of the suppression hearing." (*Id.* at 57.) Finally, the court found that counsel acted reasonably in not calling Officer Martinez. The court stated that Martinez's subjective view about putting McNary in custody was irrelevant, because custody is determined based upon the state of mind of the defendant, and McNary was unconscious. (*Id.* at 57-58.)

Under the second relevant issue addressed on direct appeal—eliciting prejudicial testimony—appellate counsel focused on trial counsel's attempt to obtain a voluntary intoxication instruction. Appellate counsel contended that McNary obviously did not qualify for the defense. (*Id.* at 13.) For that reason, it was supposedly prejudicial for trial counsel to elicit testimony about McNary's "marathon-drinking binge." (*Id.*) Appel-

late counsel went so far as to say, "[i]t is difficult to imagine that defense counsel would have questioned [McNary about excessive drinking] had he been even faintly familiar with the law regarding voluntary intoxication." (*Id.*) The appellate court, however, did not find this claim availing. The court said that it would not disturb trial counsel's strategic choices. The court explained that the evidence could have warranted giving the instruction but also justified denying it, especially in light of McNary's own statement at trial that, "I was feeling high, but . . . I think I can drive." (*Id.* at 61.) Because the state appellate court did not find any of the other claims persuasive, it affirmed McNary's convictions.

On May 1, 2002, the Illinois Supreme Court denied McNary's petition for leave to appeal. *People v. McNary*, 199 Ill. 2d 571 (2002). Subsequently, on May 23, 2002, McNary sought post-conviction relief pursuant to Illinois state law. In that proceeding, McNary raised several issues, although only one proves relevant here: ineffective assistance of counsel on direct appeal for failing to challenge the denied voluntary intoxication instruction. On August 9, 2002, the state trial court dismissed this petition as time-barred and meritless. When McNary appealed that denial, the Illinois Appellate Court reversed. *People v. McNary*, No. 1-02-2897 (Ill. App. Ct. 2004) (unpublished order). The court found McNary's petition timely and having "raised the gist of a meritorious claim" for ineffective assistance. (R. 8-5 at 27.) Therefore, the court remanded for reconsideration.

On remand, the trial court again granted the State's motion to dismiss the ineffective assistance claim. The court found counsel effective because McNary did not qualify for a voluntary intoxication instruction; thus, counsel's actions were reasonable and did not result in prejudice. McNary appealed again. This time, the Illinois Appellate Court affirmed. *People v. McNary*, No. 1-07-0777 (Ill. App. Ct. 2009) (unpublished order). The court reviewed the evidence and found that McNary's own testimony explained why he was not entitled to the instruction. This testimony included McNary's statements that he knew he hit someone but kept going because he was being chased by the police. Therefore, appellate counsel acted reasonably by not raising a meritless issue on appeal. On May 26, 2010, the Illinois Supreme Court denied McNary's petition for leave to appeal the denied post-conviction relief. *People v. McNary*, 236 Ill. 2d 566 (2010).

On March 11, 2011, McNary filed an amended petition for a writ of habeas corpus in the United States District Court for the Northern District of Illinois. In his petition, McNary asserted four claims: (1) ineffective assistance of trial counsel; (2) improper admission of McNary's involuntary statements to Investigator Ptak; (3) ineffective assistance of appellate counsel; and (4) violation of the Eighth Amendment. In an opinion issued on June 9, 2011, the district court denied relief on all claims. Then, on August 1, the same court granted McNary a certificate of appealability on the two ineffective assistance of counsel claims. McNary timely filed his appeal on those two issues.

## II. ANALYSIS

*A. Habeas Corpus Standards of Review*

The complex standards of review governing petitions for habeas corpus warrant some explanation. When a district court denies a petition, we review the denial *de novo*. *Rann v. Atchison*, 689 F.3d 832, 835 (7th Cir. 2012). As we do so, however, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) significantly confines our inquiry. 110 Stat. 1214. Today, we need only address the AEDPA provision that proves dispositive in this case: 28 U.S.C. § 2254(d). This provision applies when a prisoner who is "in custody pursuant to the judgment of a State court" petitions for habeas corpus based upon an issue "adjudicated on the merits in State court proceedings." *Id.* Such is the case here. McNary remains in custody, pursuant to a decision of an Illinois court. He contends that this custody resulted from a violation of the Sixth Amendment of the United States Constitution: ineffective assistance of trial and appellate counsels. The Illinois Appellate Court addressed both these issues on the merits. Therefore, § 2254(d) applies.

McNary alleges only an error of law, not one of fact; so, under § 2254(d), we can grant the writ only if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States*." Id.* Thus, although we technically hear this appeal from the district court, our inquiry focuses entirely on what occurred in the state court. In so doing, we look at "the decision of the

last state court to rule on the merits of the petitioner's claim." *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011). For McNary's ineffective assistance of trial counsel claim, that decision was the 2001 opinion of the Illinois Appellate Court, *People v. McNary*, No. 1-99-2370 (Ill. App. Ct. 2001) (unpublished order). For the ineffective assistance of appellate counsel claim, the relevant decision is the 2009 opinion of that court, *People v. McNary*, No. 1-07-0777 (Ill. App. Ct. 2009) (unpublished order).

As we begin considering McNary's claims in light of § 2254(d), our inquiry narrows further. The statutory phrase "contrary to, or involved an unreasonable application of, clearly established Federal law" actually includes two separate standards. 28 U.S.C. § 2254(d). The state court's decision is "contrary to" federal law if it employs the wrong legal standard established by the Supreme Court. *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Coleman v. Hardy*, 690 F.3d 811, 814 (7th Cir. 2012). Alternatively, the state court's decision unreasonably applies federal law if the "court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *accord Coleman*, 690 F.3d at 814.

Here, the state court applied the uncontested legal standard for ineffective assistance of counsel: *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. As a result, the decisions below were not "contrary to" clearly established law. 28 U.S.C. § 2254(d); *see also Cone*, 535 U.S. at 694. The sole remaining question is

therefore whether the state court decisions "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Our answer may rest only on Supreme Court precedents "as of the time the state court render[ed] its decision." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (internal quotation marks omitted). Furthermore, we must consider only the factual record presented to the state court. *Id.* at 1400. Finally, our review is "highly deferential." *Id.* at 1398. Mere disagreement with the state court does not allow us to grant relief. *Harrington v. Richter*, 131 S. Ct. 770, 785-86 (2011). We can reverse the holding below only if "there was no reasonable basis" for the state court's decisions. *Pinholster*, 131 S. Ct. at 1402.

### B. Ineffective Assistance of Counsel Standard

Because our inquiry will therefore hinge on whether the Illinois Appellate Court reasonably applied the standard for ineffective assistance of counsel, we must introduce that standard, as well. The Supreme Court has developed a two-pronged test for identifying violations of the right to effective assistance of counsel. *Strickland*, 466 U.S. at 687. The overarching inquiry is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

In making that determination, the reviewing court first considers whether "'counsel's representation fell

below an objective standard of reasonableness.'" *Richter*, 131 S. Ct. at 787 (*quoting Strickland*, 466 U.S. at 688). Under this prong of the analysis, the court strongly presumes counsel's effectiveness. *Strickland*, 466 U.S. at 689. Second, the court considers whether counsel's blunders resulted in prejudice—"'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Richter*, 131 S. Ct. at 787 (*quoting Strickland*, 466 U.S. at 694). In other words, counsel's errors must "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Notably, a court need not address the first prong of the *Strickland* test if it is easier to resolve the case on the prejudice inquiry. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (*citing Strickland*, 466 U.S. at 697). Given this high standard, even "egregious" failures of counsel do not always warrant relief. *United States v. Draves*, 103 F.3d 1328, 1335 (7th Cir. 1997).

C. *Application of the Appropriate Standards to McNary's Claims*

On habeas review, our inquiry is now whether the state court unreasonably applied *Strickland* to McNary's case. Remember, however, *Strickland* mandates strong deference to the strategic decisions of counsel. 466 U.S. at 689. Likewise, AEDPA mandates giving the state court "the benefit of the doubt" in how it applied *Strickland*. *Pinholster*, 131 S. Ct. at 1398. Thus, these standards combine to form the "doubly deferential" approach we

now apply to McNary's claims. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

*1. Ineffective assistance of trial counsel*

McNary first argues that he received ineffective assistance of trial counsel. He bases this claim on four omissions of counsel at the suppression hearing: (1) not calling Carla McNary to testify; (2) not questioning Officer Martinez about placing McNary in custody at the scene of the auto accident; (3) not asking McNary himself about his conversation with Officer Hardesty; and (4) not raising the fact that Hardesty waited until after McNary made incriminating statements to read him any sort of warning.

The first three of these claims relate to whether McNary was in custody prior to his conversation with Officer Hardesty. The answer to that question would have greatly impacted the admissibility of McNary's statements. If the interrogation occurred in a custodial environment, Officer Hardesty needed to give McNary *Miranda* warnings prior to the start of questioning. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). But Officer Hardesty did not give McNary these warnings. Thus, had McNary already been in custody, there would have been a strong basis to suppress his statements. Yet, at the suppression hearing, trial counsel conceded that McNary was not in custody and thus did not argue that *Miranda* warnings were necessary. McNary now contends that that decision was ineffective and cites the instances mentioned above to demonstrate how

counsel could have established the interrogation's custodial nature.

*a. Failure to question Carla McNary*

According to McNary, his sister, Carla, had important information about whether he was in custody and thus claims she should have been called during the suppression hearing. To begin, we note that "custody," when used in reference to *Miranda*, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). Determining whether someone is in custody depends upon "the objective circumstances of the interrogation." *Stansbury v. California*, 511 U.S. 318, 323 (1994) (*per curiam*). Specifically, custody requires that a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d).

Here, when Carla testified during a break in trial, she said that she saw McNary handcuffed to his hospital bed with a police officer sitting next to him. (R. 16-2 at 598-99.) She also testified that a nurse told her McNary was under arrest. (*Id.* at 598.) On direct appeal, the Illinois Appellate Court found that, "in light of the overwhelming evidence presented by the State," Carla's testimony, even if elicited earlier, "would have had minimal impact on the outcome of the suppression hearing." (R. 8-4 at 57.) We must now determine whether

that decision amounted to an unreasonable application of *Strickland*.

First, we note that the record is murky, at best, as to why McNary's counsel failed to called Carla earlier. The extent of the record on that issue is as follows. Trial counsel explained, "I interviewed the members of the family and I did not find [Carla's information] out [until] after the motion had been ruled upon." (R. 16-2 at 148.) The court responded, "So it's not newly discovered evidence[;] it was available. You just weren't aware of it." (*Id.*) Counsel clarified, "It's newly discovered in that when I questioned members of the family no one seemed to have that information. I did newly discover it [a few days] after the motion." (*Id.*) The court accepted this explanation and allowed counsel to put Carla's testimony on the record.

Thus, under the first prong of *Strickland*, we have only a sparse record to use in determining whether counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. True, "counsel has a duty to make reasonable investigations." *Id.* at 691. Yet, counsel can also "make a reasonable decision that makes particular investigations unnecessary." *Id.* Either way, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

Here, the record leaves unclear to what extent counsel investigated the stories of McNary's family members prior to the suppression hearing. He inter-

viewed some members of the family, but we do not know (and neither did the state appellate court) whether he interviewed Carla specifically. Given the "heavy measure of deference to counsel's judgments," *id.*, however, it was appropriate for the Illinois Appellate Court to find counsel's investigations sufficient. Counsel, after all, conducted some interviews, which immediately distinguishes this case from *Kimmelman v. Morrison*, cited by McNary to support his argument. 477 U.S. 365 (1986). In that case, trial counsel failed to conduct any discovery at all; this "total failure," in particular, persuaded the Court to find counsel ineffective. *Id.* at 386. In contrast, McNary's counsel conducted investigations; then, once he found out about Carla's information, he made sure to get her testimony on the record to preserve the matter for appeal. We find those actions reasonable.

More telling, however, is the prejudice prong of the *Strickland* standard. Reasonable jurists could disagree about the effectiveness of counsel's investigations (which still satisfies our review of the state court's decision), but the answer to the prejudice inquiry is even clearer. Had Carla testified, it seems highly unlikely that she would have affected the outcome of the suppression hearing, no less the trial. To make a difference at the hearing, Carla's testimony would have needed to overwhelm the State's countervailing evidence; otherwise, it would not have convinced the judge to suppress McNary's statements.

Carla's testimony could not have done so, due to its inherent credibility problems. Carla claims that at

"1:00 something" a.m., someone came to her house and told her about McNary's car accident. (R. 16-2 at 600.) She then claims to have traveled fifteen to twenty minutes to the hospital, where she arrived at "almost 2:00 o'clock." (*Id.* at 599.) Given the other evidence, the timing of this testimony makes little sense. McNary's auto accident occurred at 1:50 a.m. It is thus improbable that someone else could have known about the accident at "1:00 something" and that Carla could have been at the hospital at "almost 2:00 o'clock." By the time officers arrived at the scene, called for help, and extracted McNary from his vehicle, the ambulance probably did not arrive at the hospital until at least 2:00 a.m.

Furthermore, timing was critical for Carla's testimony to have any import. It was uncontested that Officer Hardesty placed McNary in custody after their discussion at approximately 3:50 a.m. Thus, Carla's testimony would have only made a difference if it suggested that McNary was in custody prior to that time. Yet, given the timing inconsistencies between Carla's information and the other evidence, combined with Carla's clear interest in helping her brother, it was reasonable for the Illinois Appellate Court to conclude, as it did, that the judge would not have credited Carla's testimony, even if it had been offered earlier.

Further still, Carla's statements could not have affected the outcome of the trial. To establish prejudice, McNary would need to show not only "a reasonable probability that he would have prevailed on the motion to suppress" but also "a reasonable probability that . . . he

would have been acquitted." *Bynum v. Lemmon*, 560 F.3d 678, 685 (7th Cir. 2009). Here, even if Carla's testimony convinced the judge to suppress McNary's statements, the outcome of the trial would not have changed. Despite McNary's contentions otherwise, the State presented enough other evidence for the jury to convict him of first-degree murder. McNary told Investigator Ptak that he hit a pedestrian, but "he did not stop because he knew that he was drunk and that there were squad cars behind him, chasing after him for striking the pedestrians [sic]." (R. 16-2 at 523.) McNary knew he was drunk and that his behavior had caused serious injury to another; yet, he persisted in driving. In other words, he knew that his actions created "a strong probability of death or great bodily harm," which satisfies the mental state of first-degree murder under Illinois law. 720 ILCS 5/9-1(a)(2). Thus, the jury could have convicted McNary of murder, even without the statements made to Officer Hardesty.[2] As a result, we cannot find any error "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. More importantly, we cannot find that the Illinois Appellate Court was unreasonable in concluding as much.

---

[2] McNary makes much of the fact that the prosecution elicited Investigator Ptak's statements through leading questions, as if to imply that this fact would discredit them enough not to sustain a conviction. This argument, however, carries no force. Defense counsel did not object to the questions at the time, and, once evidence is admitted, it becomes the province of the jury to determine its reliability. *See Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2012).

McNary's invocation of *Rompilla v. Beard*, 545 U.S. 374 (2005), does not persuade us otherwise. The Supreme Court decided *Rompilla* in 2005—nearly four years after the Illinois Appellate Court ruled on McNary's ineffective assistance of trial counsel claim. We, however, may only consider precedents at the time the state court rendered its decision. *Pinholster*, 131 S. Ct. at 1399. A court cannot apply law yet to be articulated.[3]

Finally, we note that McNary's references to circuit precedent do not help his case, except to the extent that they re-articulate holdings of the Supreme Court. Under § 2254(d), we only review the state proceedings in light of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (*per curiam*). For all these reasons, we find

---

[3] To the extent that the principles of *Rompilla* were established in 2001, they are clearly distinguishable from this case. The attorney in *Rompilla* had a duty to examine documents he knew the prosecution would use against his client. 545 U.S. at 383. Specifically, counsel knew that the prosecution sought to seek the death penalty by showing that Rompilla had a long history of criminal violence. *Id.* Nevertheless, counsel failed to examine Rompilla's prior conviction file, a public document. *Id.* at 384. Such behavior constituted ineffective assistance of counsel. *Id.* at 389-90. Here, however, McNary's trial counsel was not in that position. Whereas Rompilla's counsel had notice of useful information and completely failed to investigate, McNary's counsel did not have such notice *and* conducted some investigation. Thus, the situation here does not invoke the duty articulated in *Rompilla*.

that the Illinois Appellate Court reasonably applied federal law in determining that trial counsel was effective, even without calling Carla McNary at the suppression hearing.

### b. Failure to question Officer Martinez

At trial, Officer Martinez testified that he placed McNary "in custody" at the scene of the auto accident. (R. 16-2 at 350.) Officer Martinez also stated as much in his accident report. (R. 8-4 at 69.) Trial counsel, however, did not question Officer Martinez about this information during the suppression hearing. McNary contends that this omission constituted ineffective assistance. The Illinois Appellate Court disagreed. That court found that Officer Martinez's statement merely represented his "subjective view." (*Id.* at 57.) According to the Illinois court, the inquiry of whether someone is in custody "'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" (*Id.* at 57-58) (*quoting Stansbury*, 511 U.S. at 323). Thus, the court held, Officer Martinez's views were irrelevant at the suppression hearing, and counsel acted reasonably in not questioning him.

The Illinois Appellate Court was largely correct. *Miranda* warnings mitigate the coercive, "police-dominated atmosphere" of custodial interrogations. *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). But "[c]oercion is determined from the perspective of the suspect." *Id.* Unless a reasonable person in the suspect's position would be aware of

the situation's pressures, the subjective understandings of police officers do not impact the custody inquiry. *See Stansbury*, 511 U.S. at 325; *Perkins*, 496 U.S. at 296-97. For that reason, Officer Martinez's views would not have influenced the court's analysis, unless they were somehow manifest to a reasonable person in McNary's position. *See Stansbury*, 511 U.S. at 325. Yet, McNary was unconscious at the time Officer Martinez pulled him from the burning vehicle. Therefore, someone in McNary's position could not have known Officer Martinez's views at that time.

The question remains, however, whether McNary became aware of Officer Martinez's subjective view prior to the interview with Officer Hardesty. But testimony from Officer Martinez would not have provided an answer. Officer Martinez only remained at the scene of the auto accident long enough to remove McNary from the vehicle and place him on the ground. (R. 16-2 at 351.) Officer Martinez did not know what happened to McNary after that point, because he went back to the site of the hit-and-run with Marshall. (*Id.*) As a result, questioning Officer Martinez would not have produced any more information relevant to the custody inquiry. We thus find it appropriate for the Illinois Appellate Court to have deemed reasonable counsel's decision not to call Officer Martinez.

*c. Failure to question McNary*

In light of the previous discussion, McNary's next argument presents the natural corollary: McNary con-

tends that "trial counsel failed to ask . . . [him] about circumstances that could objectively demonstrate that he was in custody when questioned by Officer Hardesty." (Appellee's Br. at 26.) Although McNary's claim speaks to the doctrine's focus on a reasonable person in the suspect's position, his argument makes little sense given the facts of his case. McNary himself testified that he did not remember anything between running his third red light and waking up in the hospital at 10:00 a.m., including his conversation with Officer Hardesty. (R. 16-2 at 478.) Therefore, unless McNary's initial testimony was a lie, we cannot fault counsel for failing to ask McNary about that conversation's details. As we have said before, "[l]itigants must live with the stories that they tell under oath." *Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005). The Illinois Appellate Court reached the same conclusion, (R. 8-4 at 56), and we cannot find it unreasonable for having done so.

*d. Failure to question Officer Hardesty*

For his final ineffective assistance of trial counsel claim, McNary argues that counsel should have questioned Officer Hardesty more thoroughly at the suppression hearing. Specifically, McNary contends that counsel should have inquired why Officer Hardesty failed to read McNary the "Warnings to Motorist" until after he made incriminating statements. He also argues that counsel should have questioned Officer Hardesty about why he failed to give McNary *Miranda* warnings.

Regardless of any potential merit to this claim, we cannot consider it, because McNary did not present it to the state court. Generally, a petitioner must raise a claim in state court before raising it on federal habeas review. 28 U.S.C. § 2254(b)(1)(A); *see also Richter*, 131 S. Ct. at 787. This exhaustion requirement includes raising both the broad claim (here, ineffective assistance of counsel) but also the specific arguments and "operative facts" within that claim. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). McNary has not done so. Although he raised the claim of ineffective assistance of counsel in the state court, he did not raise the underlying facts regarding failure to question Officer Hardesty. Therefore, McNary has not exhausted his state court remedies on this claim, as required by 28 U.S.C. § 2254(b)(1)(A). Without evidence speaking to the exceptions described in § 2254(b)(1)(B), which McNary has not provided, we cannot consider this claim.

### 2. *Ineffective assistance of appellate counsel*

McNary also argues that he received ineffective assistance of appellate counsel. Specifically, McNary claims that appellate counsel should have appealed the denial of the voluntary intoxication jury instruction. Under Illinois law at the time of McNary's trial, defendants had an affirmative defense if the defendant was intoxicated to such an extent "as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense." 720 ILCS 5/6-3

(West 1998).[4] The state trial court found that McNary was not entitled to a jury instruction on this defense, and, on appeal, counsel did not challenge that denial.

McNary bases his argument on two premises. First, he posits that the issue of the denied instruction was obvious because much of trial counsel's elicited testimony spoke to that defense. Second, McNary contends that the error's flagrancy, in light of Illinois state precedent, compounded its obviousness. Thus, McNary argues, counsel was ineffective for missing it. In 2009, the Illinois Appellate Court disagreed. It found that counsel acted reasonably because the underlying state law claim on the instruction was meritless. (R. 8-6 at 102-03.)

Although the Illinois Appellate Court's opinion rested on a matter of state law, we must still determine whether its decision violated McNary's Sixth Amendment rights. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In satisfying that independent obligation, we will use different reasoning than that of the Illinois Appellate Court, which, again, ruled only on state law. We, however, are concerned about whether reasonable jurists could disagree with the state court's *conclusion*, not whether they could disagree over its *reasoning*. Our job is merely to determine "if there was a reasonable justification for the state court's decision." *Richter*, 131 S. Ct. at 790; *see also Pinholster*, 131 S. Ct. at 1402 ("A habeas court must determine what arguments or theories *could* have sup-

---

[4] This statute was amended in 2002 and removed voluntary intoxication as an affirmative defense. *See* 720 ILCS 5/6-3.

ported the state court's decision.") (emphasis added) (internal brackets and ellipses omitted).

The *Strickland* standard also governs a claim for ineffective assistance of appellate counsel. *Robbins*, 528 U.S. at 285. As before, the reviewing court should first look for unreasonable conduct and then for prejudice as a result of any error. *Strickland*, 466 U.S. at 687. As we consider the first prong, we note that, "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins*, 528 U.S. at 288 (*citing Jones v. Barnes*, 463 U.S. 745 (1983)). That said, it is "possible," albeit "difficult," to show that "counsel's failure to raise a particular claim" amounted to ineffective assistance. *Id.* In sum, we do not second-guess "informed strategic choices." *Strickland*, 466 U.S. at 691.

A strategic choice is precisely what we have here. McNary misconstrues the record when he contends that appellate counsel "overlooked" the issue of the voluntary intoxication instruction. (Appellee's Br. at 45.) Counsel did not miss the issue. Rather, he chose to approach it from a different angle. Appellate counsel argued that trial counsel was ineffective for attempting to use voluntary intoxication as a defense at all. (R. 8-4 at 13.) Specifically, counsel argued that,

> [i]t is difficult to imagine that defense counsel would have questioned his client about his marathon-drinking binge had he been even faintly familiar with the law regarding voluntary

intoxication. The defendant was clearly preju-
diced by his attorney's questioning him about
excessive consumption of alcohol, where there
was no possibility that the jury would receive
an instruction that would have allowed it to con-
sider voluntary intoxication as a defense.

(*Id.*)

It was reasonable for counsel to make this argument,
especially after the trial court had made clear that it
viewed the law as unquestionably against McNary on
this point. The court quoted a litany of cases and even
a treatise on Illinois criminal law to explain why McNary
did not qualify for the instruction. (R. 16-2 at 555-58.)
Because McNary had lost so decisively below on the
issue, counsel made an informed strategic choice to take
the opposite approach on appeal—claim that trial
counsel should have known such clear law. That argu-
ment would have lost much of its credibility had
counsel also appealed the denial of the instruction.

This strategy, while ultimately unsuccessful, was not
unconstitutionally misinformed. As we have said before,
"[t]he law in Illinois is clear: In order to constitute
an affirmative defense, voluntary intoxication must be so
extreme as to suspend all reason." *United States ex rel.
Simmons v. Gramley*, 915 F.2d 1128, 1135 (7th Cir. 1990)
(*citing People v. LePretre*, 552 N.E.2d 1319, 1323-24 (Ill. App.
Ct. 1990)). As such, "[w]hen the record indicates that
the defendant acted with any purpose or rationality, the
defense is unavailable." *Id.* (*citing People v. Roesler*, 552
N.E.2d 1242, 1246 (Ill. App. Ct. 1990)). We have thus

found counsel's performance reasonable, despite an unsuccessful attempt to receive a voluntary intoxication instruction, when the "petitioner's own testimony effectively negated" the defense. *Id.* (*citing People v. Arnold*, 470 N.E.2d 981, 984 (Ill. 1984)); *cf. United States v. Reed*, 991 F.2d 399, 401-02 (7th Cir. 1993) (defendant received a fair trial, despite not receiving a voluntary intoxication instruction, because the evidence did not support the level of intoxication needed to qualify for the defense, even when the defendant could not remember committing the crime due to drunkenness).

For that reason, counsel in this case acted reasonably in not appealing the denied instruction. McNary's own testimony at trial, along with his statements to Officer Hardesty and Investigator Ptak, all showed that he could form the requisite mental state. McNary knew he was drunk and that he hit a pedestrian while traveling at a high rate of speed. He was thus aware that his actions had created "a strong probability of death or great bodily harm." 720 ILCS 5/9-1(a)(2). Yet he continued to drive. This deliberate decision satisfies the mental state of first-degree murder, *id.*, while simultaneously negating the voluntary intoxication defense, *see Simmons*, 915 F.2d at 1135. Attempting to find a new way around the issue, appellate counsel argued that trial counsel prejudiced McNary by invoking the defense at all. Given the high level of deference afforded counsel in ineffective assistance claims, that strategy was a longshot, but that same deference stymies McNary now.

Our conclusion is furthered buttressed by the decision of the Illinois Appellate Court, which found chal-

lenging the denied instruction meritless under state law. This ruling shows that, if there was any error, there was no prejudice. Had counsel raised the issue, it still would have failed. We therefore find that reasonable jurists could not disagree with the conclusion of the Illinois Appellate Court: McNary received effective assistance of appellate counsel.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to deny the writ of habeas corpus.