In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3372

GERALD KAMLAGER,

*Petitioner-Appellant,*

*v.*

WILLIAM POLLARD,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10 C 667—**Rudolph T. Randa**, *Judge.*

ARGUED JANUARY 23, 2013—DECIDED APRIL 26, 2013

Before POSNER and WILLIAMS, *Circuit Judges*, and
NORGLE, *District Judge.**

NORGLE, *District Judge.* Following a jury trial, Gerald
Kamlager was convicted of first-degree intentional homi-
cide and use of a dangerous weapon in the death of
Wanda Greenlee, in violation of Wis. Stat. §§ 940.01(1)(a)

---

* Hon. Charles R. Norgle of the United States District Court
for the Northern District of Illinois, sitting by designation.

and 939.63(1)(b),[1] and was sentenced to life imprisonment with no possibility for extended supervision. He was also convicted of hiding a corpse, in violation of Wis. Stat. § 940.11(2), and was sentenced to five years' imprisonment followed by five years' extended supervision to be served consecutively. After exhausting postconviction remedies, Kamlager sought collateral relief pursuant to 28 U.S.C. § 2254. The district court denied his writ of habeas corpus petition. We granted Kamlager a certificate of appealability limited to a single issue: whether the admission of statements he made to police officers after he requested to see counsel violated his Sixth Amendment rights. *See* 28 U.S.C. § 2253(c)(2). Because we conclude that the Wisconsin Appellate Court reasonably applied Supreme Court precedent in finding that the admission of tainted evidence was harmless, we affirm the judgment of the district court denying the writ of habeas corpus.

## I. Background

Our account of the facts is drawn from the Wisconsin Appellate Court's decision affirming Kamlager's conviction on direct appeal. On December 23, 2001, Wanda's body was discovered covered with branches and brush

---

[1] The Judgment of Conviction mistakenly cites to Wis. Stat. § 939.63(1)(a), which refers to the increased penalty for a misdemeanor. However, it correctly indicates the maximum five-year increase for a felony pursuant to § 939.63(1)(b).

in a secluded wooded area—close to both Wanda and Kamlager's homes—in Walworth, Wisconsin. Wanda died as a result of gunshot wounds to the abdomen and blunt-force trauma to the head. The condition of Wanda's body was consistent with her death occurring on the date of her disappearance, November 24, 2001. Wanda's boyfriend Kamlager became the prime suspect and was eventually charged with first-degree intentional homicide, use of a dangerous weapon, and hiding a corpse. The evidence against him was extensive, albeit circumstantial.

## A. Evidence at Trial

At trial, Wanda's mother, Phyllis Greenlee, testified that the day before her daughter disappeared, Wanda went to a dog track with Kamlager. According to Phyllis, Wanda said things did not work out with Kamlager that night. Phyllis testified that on the morning of her disappearance, Wanda told her that she had received a phone call from Kamlager, and was going to meet him at Menards (a home improvement store) in Janesville. Phyllis also testified that in the Fall of 2001 Kamlager had Wanda's cell phone, which he used to call their home. The state introduced Wanda's cell phone records, reflecting that a call was placed from Wanda's cell phone to Wanda and Phyllis's home on November 24, 2001, at 8:09 a.m.

Deputy Richard Paquin testified that he interviewed Phyllis and Darrell Greenlee, Wanda's brother, on November 27, 2001. Paquin testified that upon learning about

Kamlager's phone call and Wanda's plan to meet Kamlager at Menards on the morning of her disappearance, he asked the Janesville Police Department to check the Menards parking lot. Wanda's car was found in the Menards parking lot.

When Paquin questioned Kamlager as to Wanda's whereabouts, Kamlager said he did not know where Wanda currently was but the last time he saw her was on November 23, 2001, at the dog track (the night before she disappeared). Kamlager denied having plans to meet Wanda at Menards on November 24, 2001, and said he did not know why Wanda's vehicle was parked there. Paquin advised his sergeant that "something appeared suspicious."

A formal videotaped interview followed at the sheriff's department. The video and transcript were admitted into evidence at trial, without objection. At the beginning of the interview, Kamlager was told three times that he was free to leave at anytime and that he was not under arrest. Kamlager admitted that he and Wanda were having an extramarital affair. He also admitted that he owed Wanda approximately $1,000. Kamlager stated that he and Wanda had an argument on November 23, 2001, relating to their weekend plans, and her desire to go away together for the weekend. That night, at about 7:00 p.m., Kamlager said he spoke to his brother-in-law, Richard Bender, about going hunting in Richland Center. According to Kamlager, Bender was supposed to pick him up at 3:00 a.m. the next day (November 24, 2001). Kamlager stated that he had all of

his hunting gear ready to go, packed in the truck. Paquin asked whether he would have his own weapon or shot-gun. Kamlager nodded yes and said, "A .308 [rifle]." Bender, however, did not show up at 3 a.m. Kamlager said he left at 8:00 a.m. for Richland Center to go hunting with Bender, arriving a little after 11:00 a.m. In response to further questioning, Kamlager said that he brought his hunting gear but did not have his rifle. He said Bender was supposed to bring him his father-in-law's rifle. Paquin asked Kamlager if he owned any weapons. Kamlager shook his head no, answering incon-sistently with his previous statements. Kamlager said that he and Bender spent four hours hunting and that he left for home between 2:30 and 3:00 p.m., arriving home at around 6:00 p.m.

Kamlager's videotaped statements, however, were largely controverted by the testimony of multiple witnesses at trial. Bender testified that although he and Kamlager had talked about going hunting on Novem-ber 24, 2001, their plans were never finalized. He further stated that Kamlager arrived at Richland Center at about 11:30 a.m. Bender testified that Kamlager was "acting weird" and "had something on his mind other than coming up there deer hunting." Bender said that he had hunted with Kamlager for about seven years and, on this occasion, Kamlager was not dressed in his usual hunting attire. He also said that Kamlager did not bring a gun and borrowed his extra gun. Bender testified that Kamlager left around 2:30 or 3:00 p.m., and asked him to call Kamlager's wife, Bonnie, to say that he was with him and would be coming home. Bender testified that he did not call Bonnie stating, "why should

I lie for him? [H]e wasn't up there hunting with me all day. He pretty much showed up for a couple of hours. And I know Jerry from years past, and he uses people for excuses a lot; so that's why I said I'm not going to get involved in it."

Bender's wife, Barbara Nordmeyer-Bender, testified that on November 24, 2001, she answered a collect call made to the Bender home, at approximately 9:00 a.m., from Kamlager. Barbara said that Kamlager wanted her to call Bender's cell phone and then call him back, giving her the payphone number where he could be reached. Police confirmed that this number was the number of the payphone located at the Menards in Janesville.

Kamlager's wife, Bonnie, also testified. She said that she purchased a gun for Kamlager, but did not know what caliber or type of gun it was. She also stated that Kamlager told her that he had won two or three guns. Bonnie said that on November 24, 2001, Kamlager left their house at 7:00 a.m. and returned home that night between 7:00 and 8:00 p.m. She confronted Kamlager because she expected him home earlier, but Kamlager did not respond and gave her a "deer in headlights" look. Bonnie reported Kamlager missing on November 29, 2001, having not seen him since November 26, 2001.

Kamlager's father-in-law, Wesley Bender, testified that Kamlager called him on December 5, 2001, and told him to take care of Bonnie, stating, "The bitch wanted me to leave my Bonnie for her." The same day, when police went to take Kamlager into custody on a probation hold, they found him attempting to commit suicide by

inhaling exhaust fumes from the tailpipe of his running truck.

Michael Murphy, a Wisconsin prison inmate, testified that he and Kamlager were in prison together and that Kamlager confessed that he "killed somebody in Walworth County" and was worried about it. Murphy asked if anyone had seen him, and Kamlager replied that no one had. Murphy stated that he did not believe Kamlager, but two years later, after learning that Kamlager had been charged with first-degree intentional homicide, sent a letter to Walworth County Judge Kennedy disclosing Kamlager's admission. Murphy testified that the state did not promise him anything in exchange for his testimony.

Additionally, the state introduced the following evidence. Kamlager owed Wanda a significant amount of money, approximately $35,000 to $36,000; not the mere $1,000 Kamlager claimed. Wanda's ATM card was used approximately ten times on November 26, 2001, two days after anyone reported seeing her. Surveillance video depicted Kamlager in the area of the ATM at which five withdrawals were made from Wanda's checking account. The ATM card was also used at a location approximately one-half mile from where Wanda's body was found. One of the bullets taken from Wanda's body was a fired lead .22-caliber long-rifle bullet. Three unfired .22-caliber bullets were recovered from Kamlager's hunting jacket. Kamlager owned a .22-caliber rifle that was not seen after Wanda disappeared.

**B.  Assumed Constitutional Violation at Trial**

The state also introduced statements obtained by police after Kamlager requested an attorney in his first in-custody interview, on December 5, 2001. Detective Michael Banaszynski testified that Kamlager admitted that he had seen Wanda on the day she disappeared, November 24, 2001. Kamlager admitted that he met Wanda at the Menards parking lot in Janesville to go to breakfast, but they had a fight and he returned her to her truck.

Banaszynski also testified that Kamlager wrote him letters from prison, and excerpts from the letters were read to the jury. For example, on July 24, 2002, Kamlager wrote: "Should I ever receive a letter from Bonnie saying, I just got the truck back, cleaned . . . and the computer . . . I would be so happy that I might talk for weeks." On August 25, 2002, Kamlager wrote: "I might have something . . . in my memory . . . to help solve—solve different crimes. But the way I was treated . . . for what I did . . . . When I saw a fight at the county, I asked someone important, 'What do I say I saw?' I knew I was going to prison, do I want to be labeled a snitch or not." On October 6, 2002, Kamlager wrote that he does not care if he is charged because he has nothing more to lose. On November 15, 2002, Kamlager wrote that if the items he wanted back were returned, he would be available "24/7." On December 9, 2002, Kamlager wrote that he would be available to meet at anytime.

Before trial, Kamlager moved to exclude the statements he made after exercising his right to counsel on the

grounds that these statements were obtained in viola-
tion of his Fifth, Sixth and Fourteenth Amendment
rights. The state trial court found that although Kamlager
invoked his right to counsel on December 5, 2001, he
also indicated that he might speak with Banaszynski at a
later date. The state trial court denied the motion to
suppress, determining that this was an "invitation" that
gave Banaszynski the right to reinitiate contact with
Kamlager. The Wisconsin Court of Appeals assumed,
without deciding, that Kamlager's constitutional rights
were violated through the admission of this evidence,
but nevertheless concluded that the error was harmless
because it was clear beyond a reasonable doubt that a
rational jury would have rendered the same verdict
even if the tainted evidence had been suppressed. The
Supreme Court of Wisconsin declined review.

## II. Discussion

We review the district court's denial of a petition for
writ of habeas corpus de novo. *Carter v. Thompson*, 690 F.3d
837, 843 (7th Cir. 2012). "Federal habeas relief from a
state-court criminal judgment is not easy to come by
because the Antiterrorism and Effective Death Penalty
Act of 1996 (the 'AEDPA') requires us to defer to a
great extent to the decisions of the state courts." *Thompkins
v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012) (internal quota-
tion marks and citation omitted). We review the deci-
sion of the last state court to adjudicate the merits of
the petitioner's claim—here, the 2007 opinion of the
Wisconsin Appellate Court. *McNary v. Lemke*, 708 F.3d

905, 913 (7th Cir. 2013). We may grant habeas relief only if the proceeding in the Wisconsin Appellate Court resulted in a decision that is: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) " based on an unreasonable determination of the facts in the light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

Kamlager alleges only an error of law; he does not challenge the factual findings. A state court decision is "contrary to" federal law if it applies the wrong legal standard established by Supreme Court precedent or decides a case differently than the Supreme Court on materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *McNary*, 708 F.3d at 913. Alternatively, a state court decision involves an "unreasonable application of" federal law if the state court "correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 407-08); *McNary*, 708 F.3d at 913. The focus of this inquiry is "whether the state court's application of clearly established federal law is objectively unreasonable," not whether it was merely incorrect. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 409-11). Indeed, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). An objectively unrea-

sonable application is one that falls "well outside the boundaries of permissible differences of opinion." *Carter*, 690 F.3d at 843 (internal quotation marks and citation omitted). Put differently, a state court decision involves a reasonable application of federal law if it is "at least minimally consistent with the facts and circumstances of the case." *Hall v. Zenk*, 692 F.3d 793, 798 (7th Cir. 2012) (internal quotation marks and citation omitted).

Kamlager argues that the state trial court unreasonably applied *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny in admitting statements he made to police officers after he requested counsel. Relying on *Brecht v. Abrahamson*, 507 U.S. 619 (1993), Kamlager maintains that the tainted evidence could be interpreted as tacit admissions of guilt and therefore the error was not harmless because it necessarily had a substantial and injurious effect on the jury's verdict. However, where, as here, the state court has conducted a harmless-error analysis, our role is to decide whether that analysis was a reasonable application of *Chapman v. California*, 386 U.S. 18 (1967). *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009); *see also Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam).

Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. An error is harmless if the state proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* In applying *Chapman*, the Supreme Court has articulated the inquiry in alternative wording: "Is it clear beyond a

reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder v. United States*, 527 U.S. 1, 18 (1999). If the state court reasonably applied the *Chapman* standard, "the federal case is over and no collateral relief issues." *Johnson*, 572 F.3d at 404. But if the state court unreasonably applied the *Chapman* standard, we must make an independent decision, applying the *Brecht* standard of "actual prejudice" to determine whether the error was harmless. *Id.*

Here, the Wisconsin Appellate Court assumed, without deciding, that the statements Kamlager made after exercising his right to counsel were admitted in error, but reasoned that "if it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent trial error, then the error did not contribute to the verdict, and it is therefore harmless." The Wisconsin Appellate Court, citing *State v. Hale*, 691 N.W.2d 637 (Wis. 2005), articulated relevant factors in applying the *Chapman* standard, including the nature of the state's case, the frequency of the error, the importance of the erroneously admitted evidence, whether the erroneously admitted evidence corroborates or duplicates other untainted evidence, the nature of the defense, and the strength of the state's case. The Wisconsin Appellate Court's reliance on these factors is consistent with *Chapman*. *Mereness v. Schwochert*, 375 F. App'x 612, 616 (7th Cir. 2010) (non-precedential order). The Wisconsin Appellate Court concluded that given the overall strength of the state's case, a rational jury would have rendered the same verdict absent the tainted evidence.

In determining that the *Miranda* error was harmless, the Wisconsin Appellate Court evaluated and rejected Kamlager's argument—that the state improperly relied on Kamlager's inadmissible statement to contradict his previous statement to police that he had not seen Wanda on the day she disappeared—finding that the state introduced untainted evidence from which a jury could rationally draw the same conclusion. Specifically, the Wisconsin Appellate Court found that the erroneously admitted evidence was strongly corroborated by evidence that Kamlager met with Wanda on the day she disappeared and lied when he told detectives that he had not. For example, the state presented phone records and testimonial evidence that Kamlager made a collect call on November 24, 2001, at almost 9:00 a.m., from a payphone located at the Janesville Menards (where Wanda's car was found); that Wanda received a phone call the morning of her disappearance from Kamlager and that she was going to meet him at Menards; that a call was placed from Wanda's cell phone to Wanda and Phyllis' home at 8:09 a.m. on November 24, 2001; and that Kamlager had Wanda's cell phone during the Fall of 2001 (including the weekend this call was placed).

The Wisconsin Appellate Court concluded that the error was harmless because the remaining evidence against Kamlager was strong. The Wisconsin Appellate Court identified compelling circumstantial evidence pointing to Kamlager as the perpetrator, including, *inter alia*, a discredited account of Kamlager's whereabouts on the day of Wanda's disappearance; his strange

behavior on the day of Wanda's disappearance and thereafter; his large debt (approximately $35,000 to $36,000) owed to Wanda; his presence, captured on video surveillance, in the area of the ATM at which five of ten withdrawals were made from Wanda's checking account two days after she went missing; his conversation with his father-in-law, in which Kamlager told him to take care of Bonnie and stated, "The bitch wanted me to leave my Bonnie for her"; expert testimony that three unfired .22-caliber bullets were recovered from Kamlager's hunting jacket (one of the bullets taken from Wanda's body was a fired lead .22-caliber long-rifle bullet); and his .22-caliber rifle was not seen after Wanda disappeared.

Kamlager argues that the Wisconsin Appellate Court's decision is unreasonable—despite the state's presentation of a strong, albeit circumstantial, case—because, in his view, admission of his unconstitutionally-obtained contradictory statement (which he characterizes as a "*de facto* confession") is per se reversible error. Not so. The Supreme Court has rejected a per se rule of prejudice in cases involving suppressible confessions. *Premo v. Moore*, 131 S. Ct. 733, 744 (2011). In rejecting a per se rule, the Supreme Court addressed its previous application of the harmless-error standard in *Arizona v. Fulminante*, 499 U.S. 279 (1991), wherein it held that an improperly admitted confession was not harmless under *Chapman* because the remaining evidence against the defendant was weak. *Id.* The Supreme Court reaffirmed the legal standard announced in *Neder* (paraphrasing *Fulminante*) that, for direct review following an acknowledged con-

stitutional error at trial, the state has "the burden of showing that it was 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Id.* (quoting *Neder*, 527 U.S. at 18).

At the time of the Wisconsin Appellate Court's decision, the harmless-error standard as established by Supreme Court precedent, including *Fulminante* and *Neder*, provides that the strength of the state's case absent the error was relevant. Thus, the mere fact that the jury was presented with improperly admitted statements does not, in and of itself, constitute reversible error. Nor does the fact that the remaining evidence against Kamlager was circumstantial in nature. *See United States v. Reyes*, 270 F.3d 1158, 1169 (7th Cir. 2001) ("Circumstantial evidence is of equal probative value to direct evidence, and in some cases is even more reliable." (internal quotation marks and citations omitted)).

In any event, Kamlager's admission that he had seen Wanda on the day she disappeared simply does not amount to "a full confession in which the defendant discloses the motive for and means of the crime," which may have tempted the jury to "rely upon that evidence alone in reaching its decision." *Fulminante*, 499 U.S. at 296. Kamlager merely stated that he met Wanda at the Menards parking lot in Janesville to go to breakfast but they had a fight and he returned her to her truck, where he had last seen her. We reject Kamlager's argument to the extent he claims that this evidence is uniquely distinctive, critical evidence against him. The Wisconsin Appellate Court reasonably found that the state pre-

sented untainted corroborating evidence from which a rational jury could conclude that Kamlager met with Wanda on the day she disappeared. Further, the court reasonably found the testimony relating to the other tainted exchanges between Banaszynski and Kamlager "relatively less important." Under § 2254(d)(1), we may not substitute our own judgment for that of the state court. *See Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002).

Finally, Kamlager argues that the Wisconsin Appellate Court's decision is unreasonable because it failed to analyze whether the prosecutor impermissibly emphasized the tainted evidence. The Wisconsin Appellate Court concluded that even if Kamlager was correct in his assertion that the state relied on the tainted evidence in substantial part, the error was nonetheless harmless because it is clear beyond a reasonable doubt, in light of the overwhelming untainted evidence in the case, that a rational jury would have rendered the same guilty verdict absent the error. Although the Wisconsin Appellate Court assigned no weight to the state's references to the tainted evidence, its decision was nonetheless a reasonable application of *Chapman*. The Wisconsin Appellate Court's conclusion is consistent with the facts and circumstances of the case. We therefore find that fairminded jurists could not disagree with the Wisconsin Appellate Court. Because the evidence against Kamlager was overwhelming, any error in admitting statements he made to police officers after he requested to see counsel was harmless.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's decision to deny Kamlager's habeas corpus petition.